# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-CA-00117-SCT

*MICHAEL JOSEPH JOHNSON a/k/a MICHAEL J. JOHNSON a/k/a MICHAEL JOHNSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/25/2022 |
| TRIAL JUDGE: | HON. STEVE S. RATCLIFF, III |
| TRIAL COURT ATTORNEYS: | JOHN G. HOLADAY |
| | JOSHUA MICHAEL COE |
| | KATHRYN LINDSEY NEWMAN |
| | MICHAEL GUEST |
| | JONATHAN MATTHEW EICHELBERGER |
| | MARLIN A. MILLER |
| | GREGORY VINSON MILES |
| | HEIDLE CARTER SMITH |
| | JACQUELINE LANDES PURNELL |
| | M. BRADLEY MILLS |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT, JR. |
| NATURE OF THE CASE: | CRIMINAL - POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 09/05/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. In 1998, Michael Johnson was months shy of his eighteenth birthday when he plotted

with his friend Aaron Johnson (no relation) to kill Aaron's roommate, Dustin Sean Parker. While sitting around Aaron's house, Johnson asked Aaron if he had ever thought about killing anyone. For hours, Aaron and Johnson batted around different ideas of how they could kill Parker—including shooting him and making it look like a hunting accident. The two eventually settled on beating Parker to death with a metal barbell. Because they realized beating Parker with a heavy weight-lifting bar would involve lots of blood, they lined Parker's bedroom with plastic garbage bags while he slept. Having applied this protective layer, they bludgeoned him to death. After murdering Parker, Johnson and Aaron wrapped Parker's body in the plastic bags and buried him in the woods. They then returned to Aaron's home and cleaned the crime scene.

¶2. Johnson and Aaron each made up stories about what had happened to Parker. But over the next year, Johnson bragged to several others about how he had killed Parker and disposed of his body. Initially, Johnson was believed to be joking until the body was found in the exact location he described. At trial, Johnson denied he was the one who actually killed Parker—but he admitted to participating in everything else.

¶3. A jury found Johnson guilty of deliberate-design murder.[1] The trial court sentenced Johnson to life in prison—the only available sentencing option for deliberate-design murder.[2]

---

[1] *Johnson v. State*, 876 So. 2d 387, 389-90 (Miss. Ct. App. 2003), *cert. denied*, 878 So. 2d 66 (Miss. 2004) (table); *see* Miss. Code Ann. § 97-3-19(1)(a) (Supp. 1998).

[2] Miss. Code Ann. § 97-3-21 (Rev. 1994).

And under the parole statute, Johnson was not parole eligible.[3]

¶4.     Twelve years later, the United States Supreme Court handed down *Miller v. Alabama*,[4] which declared unconstitutional the imposition of mandatory life-without-parole sentences on defendants who were under eighteen at the time of their crimes. With this Court's permission, Johnson filed a petition for post-conviction relief in the trial court. He asserted that, based on *Miller*, his mandatory life-without-parole sentence was unconstitutional.

¶5.     The trial court agreed that, although Johnson was sentenced to life, the application of the parole statute meant his sentence was really a life-without-parole sentence. Because *Miller* requires the sentencing authority to make an individualized consideration before imposing a life-without-parole sentence, the trial court vacated Johnson's sentence. The trial court then conducted a sentencing hearing in which the *Miller* factors were considered individually. After doing so, the judge reinstated Johnson's life sentence—again, the only available statutory sentence. Further, the trial court held that, under the circumstances, the application of the parole statute—namely, the provision that removes parole eligibility for first-degree murderers—was not constitutionally prohibited.

¶6.     Johnson appealed to this Court. He makes two arguments. First, he asserts the trial

---

[3] Miss. Code Ann. § 47-7-3(1)(g) (Supp. 1995). Since Johnson's conviction, the parole-eligibility statute has been updated numerous times. But with every amendment, Section 47-7-3 precludes Johnson from being eligible for parole. Currently, Section 47-7-3(1)(d) directs that "[n]o person sentenced for murder in the first degree, whose crime was committed on or after June 30, 1995, . . . shall be eligible for parole[.]" Miss. Code Ann. § 47-7-3(1)(d) (Rev. 2023).

[4] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

court misapplied law and misinterpreted facts when sentencing him to life in prison without parole. Second, he claims Mississippi Code Section 99-19-101 (Rev. 2020) requires jury sentencing for juveniles convicted of deliberate-design, or first-degree, murder.

¶7. But Johnson's statutory jury-sentencing argument fails based on the recent statutory amendments aimed at addressing juvenile sentencing for first-degree and capital murder in light of *Miller*.[5] While a juvenile offender convicted of first-degree murder after July 1, 2024, may only be sentenced to life by a jury, "[f]or a juvenile offender"—like Johnson—"who was convicted of first-degree murder or capital murder prior to July 1, 2024, and who is entitled to a hearing under this subsection, the judge . . . shall fix the penalty."[6] That is exactly what happened here.

¶8. Turning to Johnson's substantive argument, the trial judge conducted a *Miller* hearing. During this hearing, he considered evidence from Johnson's primary witness, forensic psychologist Dr. Criss Lott. He also heard from the State's witness, police investigator Greg Eklund. The trial judge then considered the *Miller* factors[7] and found Johnson's age and maturity, home life, ability to assist in his defense, the heinousness and deliberateness of his crime and ensuing cover-up, and the uncertainty surrounding his potential rehabilitation all supported his life-without-parole sentence was constitutional. Because the trial judge applied

---

[5] S.B. 2022, Reg. Sess., 2024 Miss. Laws ch. 526.

[6] Miss. Code Ann. § 97-3-21(2)(b), (d) (effective July 1, 2024).

[7] *Parker v. State*, 119 So. 3d 987, 994-96 (Miss. 2013) (listing the several factors the United State Supreme Court in *Miller*, 567 U.S. at 477-78, said should be taken into consideration when sentencing a juvenile).

4

the correct law and supported his conclusions with substantive evidence, we do not disturb his sentencing decision on appeal. We thus affirm the trial judge's case-specific determination that Johnson should remain parole ineligible.

**Discussion**

**I.      Section 99-19-101 does not apply.**

¶9.      We begin with Johnson's second argument—that Section 99-19-101's jury-sentencing scheme applied.

¶10.    We note that even before the Legislature took action, Johnson's argument was dead on arrival. First, Johnson waived this claim because he neither asserted to the trial court that Section 99-19-101 somehow controlled nor requested that a jury, and not the trial judge, resentence him. *Smith v. State*, 729 So. 2d 1191, 1205-06 (Miss. 1998). Second, Johnson's argument was contrary to this Court's precedent that Section 99-19-101 "does not apply in the post-conviction-relief context when a petitioner seeks review of his sentence based on *Miller*." *Dampier v. State*, 375 So. 3d 1149, 1153 (Miss. 2023) (citing *McGilberry v. State*, 292 So. 3d 199, 207 (Miss. 2020); *Wharton v. State*, 298 So. 3d 921, 925 (Miss. 2019)).

¶11.    But the Legislature recently did take action—action specifically aimed at sentencing juveniles in light of *Miller*. S.B. 2022, Reg. Sess., 2024 Miss. Laws ch. 526, § 2 (effective July 1, 2024). The Legislature decided that Section 99-19-101 "shall not apply to a juvenile offender who was not at least eighteen (18) years of age at the time of the commission of the offense." *Id.* (amending Miss. Code Ann. 99-19-101). Instead, "[a] juvenile offender convicted of capital murder shall be sentenced pursuant to Section 97-3-21(2)"—the statute

5

that also governs sentencing juvenile offenders convicted of first-degree murder. *Id.*

¶12.    Consistent with this Court's holdings in ***Moore v. State***[8]—which held that the *prospective* application of Miller requires jury sentencing for capital murder—and ***Dampier***, ***McGilberry***, and ***Wharton***[9]—which held that the *retroactive* application of ***Miller*** required only a sentencing hearing before the trial judge—amended Section 97-3-21(2) now contains the following sentencing scheme based on the timing of the juvenile's conviction:

> (b) A juvenile offender[10] who is convicted of first-degree murder *after July 1, 2024*, may be sentenced to life imprisonment in the custody of the Department of Corrections if the punishment is so fixed by the jury. If the jury fails to fix the penalty at life imprisonment, the court shall fix the penalty at not less than twenty (20) nor more than forty (40) years in the custody of the Department of Corrections.

> (c) A juvenile offender who is convicted of capital murder *after July 1, 2024*, may be sentenced to life imprisonment in the custody of the Department of Corrections or life imprisonment without eligibility for parole in the custody of the Department of Corrections if the punishment is so fixed by the jury. If the jury fails to fix the penalty at life imprisonment or life imprisonment without parole, the court shall fix the penalty at not less than twenty-five (25) nor more than fifty (50) years in the custody of the Department of Corrections.

[But]

> (d) For a juvenile offender who was convicted of first-degree murder or capital murder *prior to July 1, 2024*, and who is entitled to a hearing under this subsection, the judge who presided over the trial, or a judge appointed by the senior circuit judge, if the presiding judge is unavailable, shall fix the penalty.

---

[8] ***Moore v. State***, 287 So. 3d 905, 917-20 (Miss. 2019).

[9] ***Dampier***, 375 So. 3d at 1155; ***McGilberry***, 292 So. 3d at 206; ***Wharton***, 298 So. 3d at 928.

[10] Amended Section 97-3-21(2)(a) defines a juvenile offender as "a person who had not reached the age of eighteen (18) years at the time of the commission of the offense."

Miss. Code Ann. § 97-3-21(2) (effective July 1, 2024) (emphasis added); S.B. 2022, Reg. Sess., 2024 Miss. Laws ch. 526, § 1.

¶13. Johnson was convicted of first-degree murder before July 1, 2024. Thus, he was not statutorily entitled to jury sentencing on his *Miller*-based claim. § 97-3-21(2)(d).

## II. The application of the parole-ineligibility statute to Johnson's life sentence is not unconstitutional.

¶14. Turning to the constitutionality issue, Johnson argues the trial judge misapplied law and misinterpreted the facts when ruling that Section 47-7-3 should apply to Johnson's life sentence—thus making him ineligible for parole. But we detect no legal error by the trial court. A *Miller*-based sentencing decision is reviewed for abuse of discretion. *McGilberry*, 292 So. 3d at 208. Because the trial court supported its decision to apply the parole-ineligibility statute to Johnson's life sentence, we do not disturb its decision on appeal.

### A. The *Miller* Factors

¶15. While the constitutional prohibition against cruel and unusual punishment "forbids a sentencing scheme that *mandates* life in prison without possibility of parole for juvenile offenders," *Miller*, 567 U.S. at 479 (emphasis added), this prohibition does not "foreclose a sentencer's ability to impose life without parole on a juvenile[.]" *Montgomery v. Louisiana*, 577 U.S. 190, 195, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016) (citing *Miller*, 567 U.S. at 480). In *Miller*, the United States Supreme Court "recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified." *Montgomery*, 577 U.S. at 208 (citing *Miller*, 567 U.S. at 479-80).

7

¶16. To ensure a life-without-parole sentence imposed on a juvenile is proportional and thus constitutional, the sentencer must "take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Montgomery*, 577 U.S. at 208 (quoting *Miller*, 567 U.S. at 480). The *Miller* Court identified several factors to consider, which this Court adopted in *Parker*—

(1)     the juvenile offender's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences";

(2)     "the family and home environment that surrounds [the juvenile offender]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional";

(3)     "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him";

(4)     whether "he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and

(5)     "the possibility of rehabilitation[.]"

*Parker*, 119 So. 3d at 995-96 (quoting *Miller*, 567 U.S. at 477-78).

### B.     The Sentencing Hearing

#### 1.     Dr. Criss Lott

¶17. At the *Miller* hearing, Johnson's primary witness was forensic psychologist Dr. Criss Lott.[11] Before the hearing, Dr. Lott interviewed Johnson, Johnson's mother, and Johnson's

---

[11] Johnson's mother also briefly testified, mainly corroborating that the information she provided to Dr. Lott was accurate. And Johnson additionally called a former chairman of the Mississippi State Parole Board, who testified about the general parole process.

prison case worker, among others. He also reviewed Johnson's school, prison, and medical records before compiling a fifty-two-page expert report.

¶18. Dr. Lott testified about Johnson's "very dysfunctional" upbringing. His mother abandoned him early, and his father was abusive. His older sister was a positive influence and figure in his life. But she left their home when Johnson was fourteen. Basically unsupervised, Johnson began using drugs, which exhibited poor judgment. Dr. Lott conceded on cross-examination that around this same time, Johnson began spending significant time with his mother, who had remarried and whose husband had a positive influence on Johnson.

¶19. According to Dr. Lott, at the time of the crime, Johnson had not been any more mature than a regular seventeen-year-old. But the prior year, when Johnson had been kicked out of high school, Johnson chose to go to Camp Shelby and get a GED. Dr. Lott described this as "a positive point for him." Further, Dr. Lott admitted it "was a little unusual" that Johnson would, shortly after the crime, end up in the Marines. "If I hadn't known that, where his trajectory was headed," he opined, "I would not have thought the Marines."

¶20. Dr. Lott also expressed that Johnson's ability to both plan and then conceal his crime showed mental maturity. While Dr. Lott did not believe Johnson initiated the murder, he acknowledged that Johnson had participated. And he could not and did not say that Johnson had been pressured into doing so. In Dr. Lott's opinion, at the time of the crime, Johnson understood right from wrong. And when he was tried, Johnson was capable of assisting with his defense.

9

¶21. On cross-examination, Dr. Lott admitted that Johnson had changed his story about the crime. He had done so multiple times. Johnson's girlfriend described him as manipulative. Johnson had also faked psychological issues. But Dr. Lott insisted Johnson had been a model prisoner, with one of the best MDOC records Dr. Lott had ever seen. Dr. Lott opined Johnson had a "potential" for rehabilitation and a low risk of reoffending. But when pressed, Dr. Lott could not say to a reasonable degree of psychological certainty that Johnson would not reoffend.

### 2. *Investigator Greg Eklund*

¶22. In response, the State called Investigator Greg Eklund, who investigated Parker's murder while working for the Rankin County Sheriff's Department. According to Eklund, this was not a spontaneous crime. Instead, Aaron and Johnson had discussed killing Parker for "several hours." They then waited for Parker to come home from church. Once home, they waited for several more hours until Parker fell asleep. And an hour or two after midnight, they went into Parker's room and took turns bashing his head in. According to Aaron, as Parker gurgled, struggling to breathe, Johnson finished him off by first choking him with his hands, then a shirt. After killing Parker, they buried his body, taking additional steps to ensure his grave would not sink in—and thus potentially be discovered—when Parker's body decomposed and the grave settled.

¶23. Eklund testified that, after his arrest, Johnson initially suggested "maybe it was his dad that killed [Parker] because his dad would act weird every time helicopters would fly over toward the house." Johnson then shifted his story to self-defense, claiming he grabbed a pipe

after Parker pulled a knife on Aaron. Johnson later admitted he had lied about his dad and his self-defense claim.

### C. The Trial Court's Decision

¶24. When the hearing concluded, the trial court discussed and applied the *Miller* factors. The court found they weighed toward Johnson's remaining parole-ineligible.

#### A. *Chronological Age*

¶25. First, the trial court considered Johnson's chronological age during the murder—seventeen years and seven months. The judge noted by comparison that in *Miller*—and its companion case *Jackson v. Hobbs*[12]—the defendants had been fourteen years old. Citing a case from the Mississippi Court of Appeals, *Hudspeth v. State*, 179 So. 3d 1226 (Miss. Ct. App. 2015), the judge suggested the appellate court had found being seventeen differed significantly from the much younger fourteen-year-old defendants in *Miller* and *Jackson*. Because no evidence suggested Johnson was intellectually or emotionally immature for his age, the trial court concluded his chronological age weighed in favor of his original life-without-parole sentence.

¶26. On appeal, Johnson argues the trial court's reliance on *Hudspeth* was misplaced. He insists the opinion did "not contain any language concerning the significant difference between 17 and 14 with respect to *Miller* analysis." But it is obvious that, while citing *Hudspeth*, the language the trial court had actually relied on came from this Court's opinion in *Wharton*, 298 So. 3d at 929.

---

[12] *Jackson v. Hobbs*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

11

¶27.    It was the trial court in *Wharton* that "found a significant difference between Wharton's maturity and his ability to appreciate consequences at age seventeen and that of the *Miller* and *Jackson* defendants, who were fourteen years of age at the time of their crimes." *Wharton*, 298 So. 3d at 929 (citing *Miller*, 567 U.S. at 465).  And it was the trial court in *Wharton* that cited *Hudspeth*'s holding as supporting its conclusion.  298 So. 3d at 929.

¶28.    So the trial judge in Johnson's case had indeed relied on *Wharton*.  And his reliance was not misplaced.  Wharton was actually six months younger than Johnson when he committed capital murder.  And this Court found no error in the trial court's taking Wharton's chronological age—which was older than the juvenile defendants in *Miller* and *Jackson*—into consideration.  Just as in this case, the trial judge in *Wharton* "found no evidence to indicate that Wharton was intellectually or emotionally immature for his age." 298 So. 3d at 929.

¶29.    Johnson additionally argues that his being almost eighteen during the crime does not mean he was not immature.  Analysis of this factor required the trial court to consider not just Johnson's chronological age but also "its hallmark features" such as "immaturity, impetuosity, and failure to appreciate risks and consequences." *Parker*, 119 So. 3d at 995 (quoting *Miller*, 567 U.S. at 477).  But contrary to Johnson's suggestion, the trial judge did consider these features. And he found no evidence indicated Johnson was immature.  Nor was there evidence he was impetuous or unable to understand the consequences of his actions. Because the trial court supported his conclusion with substantial evidence—namely,

Dr. Lott's expert opinion and the opinion of the clinical psychologist who interviewed Johnson in 2000 before his murder trial—this Court will not disturb his conclusion that this factor favored Johnson's life-without-parole sentence.

### 2. Family and Home Environment

¶30. Next, the trial court considered Johnson's home and family environment. The trial judge acknowledged that Johnson grew up in a "dysfunctional and abusive home." But the judge also found it significant that, at age sixteen, when expelled from school, Johnson "opted to go to Camp Shelby where he earned his GED . . . , and he ultimately went on to enlist in the Marine Corp." Because Johnson "appeared to extricate himself" from his dysfunctional home situation, the judge found this factor favored Johnson's life-without-parole sentence.

¶31. Johnson suggests the trial court wrongly relied on his joining the Marines *after* he turned eighteen and thus was no longer a juvenile. But the record shows the judge *did not* exclusively rely on Johnson's post-eighteen actions. To the contrary, the judge also considered that Johnson—at age sixteen—chose to go to Camp Shelby and get his GED. Moreover, Johnson's own expert—in the context of discussing Johnson's difficult home life—noted that Johnson, by joining the Marines when he turned eighteen, veered from the otherwise expected negative trajectory of someone with his upbringing. Because the trial judge supported his assessment of this factor with evidence of Johnson's life *before* he turned eighteen and Johnson's own expert's opinion, this Court leaves this finding undisturbed on appeal.

### 3. *Circumstances of the Homicide*

¶32. The judge also found the circumstances of the homicide favored Johnson's life-without-parole sentence. Unlike the defendants in *Miller*, Johnson's crime was deliberate and heinous. According to Aaron, Johnson's accomplice, Johnson asked Aaron if he had ever thought of killing anyone. The two contemplated how they could kill Parker, eventually settling on bludgeoning him to death with a barbell. They then waited for Parker to return from church and fall asleep. The two crept inside his room and prepped the area around Parker's bed with plastic garbage bags. And they took turns smashing Parker's head in, with Johnson ultimately finishing Parker off by strangling his neck with his hands and a shirt. After carrying out the planned murder, Johnson went to great lengths to conceal his crime.

¶33. On appeal, Johnson argues that all juvenile homicides requiring *Miller* analysis involve terrible crimes. So the mere fact he committed premeditated murder does not itself make him parole ineligible. But the trial judge obviously relied on more than Johnson's having committed deliberate-design murder. The judge specifically considered Johnson's participation. And Johnson's own expert conceded that, while Johnson maintains the murder was Aaron's idea, not his, Johnson was not pressured into participating. Because the trial court properly considered this factor and supported his conclusion with substantial evidence, we will not disturb this finding on appeal.

### 4. *Incompetencies Associated with Youth*

¶34. Additionally, the trial court considered whether Johnson "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth," such as

14

the "inability to deal with police officers or prosecutors (including on a plea agreement) or [the] incapacity to assist his own attorneys." *Parker*, 119 So. 3d at 995 (quoting *Miller*, 567 U.S. at 477-78). The trial judge found this factor favored Johnson's life-without-parole sentence.

¶35. The judge emphasized there was evidence "Johnson had prior experience with law enforcement . . . and understood the charges he faced in these proceedings." Specifically, "Dr. Lott testified that . . . Johnson had experience with the legal system and was capable in assisting in his own defense." On appeal, Johnson does not challenge the trial court's conclusion regarding this factor.

### 5. *Possibility of Rehabilitation*

¶36. Finally, the trial judge considered the possibility of Johnson's rehabilitation. On one hand, the trial court acknowledged Johnson testified he felt remorse and has tried to better himself in prison even facing no possibility of parole. And Dr. Lott's and Johnson's mother's testimony support Johnson's assertions. But on the other hand, the trial judge found it "difficult to predict whether Johnson's future behavior will conform to his behavior while incarcerated." When pressed by the court, Dr. Lott conceded that he could not "say with a reasonable degree of psychological certainty that [Johnson] would not reoffend," adding "[n]obody would be able to do that."

¶37. Johnson suggests on appeal that it is reversible error for the trial judge court not to make a finding on this factor. But the mere lack of a finding on a *Miller* factor is not itself reversible error. As this Court has held, "nothing in *Miller* or *Parker* requires trial courts to

15

issue findings on each factor[.]" ***Chandler v. State***, 242 So. 3d 65, 68 (Miss. 2018). Johnson maintains his good prison record and Dr. Lott's testimony is evidence his rehabilitation is not only possible but likely. That factor alone, however, weighed against the trial court's findings on the other factors, does not undermine the trial court's determination that Johnson's life sentence should be without parole. This is especially true considering Dr. Lott could not even say to a reasonable degree of psychological certainty that Johnson would not reoffend.

### Conclusion

¶38. Having fully considered the ***Miller*** factors, the trial court determined that, under the specific circumstances of this case, sentencing Johnson to life without parole was not unconstitutional. The trial court applied the correct law and supported its decision with substantial evidence. So we affirm the sentencing order that directs that Section 47-7-3(1)(d) should apply to Johnson's life sentence, making him parole ineligible.

¶39. **AFFIRMED.**

**RANDOLPH, C.J., BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. COLEMAN, J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, P.JJ.**

**COLEMAN, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶40. I agree with the Court's holding because, as the majority points out, the Legislature has now amended the pertinent sentencing statutes to allow for the resentencing of defendants such as Johnson without a jury. I write separately solely to note my continued disagreement with the Court's earlier opinions in ***Dampier v. State***, 375 So. 3d 1149 (Miss.

16

2023); *McGilberry v. State*, 292 So. 3d 199 (Miss. 2020); and *Wharton v. State*, 298 So. 3d 921 (Miss. 2019). *See* Maj. Op. ¶ 10.

¶41.    As I wrote in *Wharton*, "[t]he wording of Section 99-19-101 bears no exceptions, other than waiver by both the State and the defendant, to the statutory directive that a jury must decide the sentence following a conviction for capital murder." 298 So. 3d at 937 (¶ 68) (Coleman, J., dissenting) (citing Miss. Code Ann. § 99-19-101)(1) (Rev. 2015)). When a statute is unambiguous, "the court should simply apply the statute according to its plain meaning[,]" as "the ultimate goal of this Court is to discern and give effect to the legislative intent." *Clarke Cnty., Miss. v. Quitman Sch. Dist.*, 378 So. 3d 353, 357 (¶ 11) (Miss. 2024) (quoting *Wayne Cnty. Sch. Dist. v. Morgan*, 224 So. 3d 539, 542 (Miss. 2017)). The pre-amendment sentencing statute was clear, as we previously held, that "every capital-murder sentence is subject to Section 99-19-101, given its unambiguous language." *Moore v. State*, 287 So. 3d 905, 918 (¶ 52) (Miss. 2019). The statute "uses mandatory language requiring that a separate sentencing hearing *shall* take place . . . 'before the trial jury as soon as practicable.'" *Id.* (¶ 51); Miss. Code Ann. § 99-19-101(1) (Rev. 2020). The Legislature used mandatory language, affording "no discretion in sentencing" and did not provide for any exceptions other than waiver. *Id.*

¶42.    The Legislature has now amended Section 99-19-101 to provide an exception to the jury-sentencing requirement for defendants who are not at least eighteen years old when they commit the crime of capital murder. S.B. 2022, Reg. Sess., 2024 Miss. Laws ch. 526, § 1 (effective July 1, 2024). Now that the Legislature has done so, defendants in the position of

17

Dampier, McGilberry, and Wharton, *i.e.*, facing resentencing following the vacation of their life-without-parole sentences pursuant to *Miller*, do not have a statutory right to be sentenced by a jury. *Id.* Such became the case, however, only after the effective date of the amendment to Section 99-19-101, which had not yet occurred when the Court handed down its decisions in the three cases. Accordingly, I respectfully maintain my dissents in *Dampier*, *McGilberry*, and *Wharton*.

**KITCHENS AND KING, P.JJ., JOIN THIS OPINION.**